1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DANIEL R. MCNUTT (SBN 7815)
MATTHEW C. WOLF (SBN 10801)
CARBAJAL & MCNUTT, LLP
625 South Eighth Street
Las Vegas, Nevada 89101
Tel.: (702) 384-1170 / Fax.: (702) 384-5529
drm@cmlawnv.com
mcw@cmlawnv.com
*Attorneys for Defendants Continental Incorporated, Inc.,
and Leapers, Inc.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ADRISH BANERJEE, an individual, and YAN HE, an individual, <br><br> Plaintiffs <br><br> vs. <br><br> CONTINENTAL INCORPORATED, INC., d/b/a CONTINENTAL ENTERPRISES, an Indiana Corporation, LEAPERS, INC., a Michigan Corporation, and DOES 1-10, inclusive, <br><br> Defendants. | Case No.: 2:17-cv-00466-APG-GWF <br><br> **DEFENDANTS' SPECIAL MOTION TO DISMISS PURSUANT TO NRS 41.635-70 (ANTI-SLAPP)** <br><br> **ORAL ARGUMENT REQUESTED PURSUANT TO LR 78-1[1]** |

"Defendants"[2] hereby move this Court for an order dismissing, in part, Plaintiffs' Complaint pursuant to Nevada's Anti-SLAPP statute, NRS 41.635-70.  Defendants pray that this Court dismiss with prejudice Counts I, III, IV, V, VI, VII, IX and X (*e.g.*, all but Plaintiffs' federal Sherman Act and Section 1983 claims) of Plaintiffs' Complaint (ECF No. 2), award such reasonable attorneys' fees and costs per statute, and such other relief to which they may show themselves entitled.

## I.    INTRODUCTION.

The First Amendment to U.S. Constitution grants every person free speech rights to speak freely on matters of public interest and concern, as well as to petition the government for redress of

---

[1]      Because a ruling on this motion must take place within 20 days, NRS 41.660, Defendants respectfully request that oral argument be scheduled within that time frame.
[2]      "Defendants" refers to Defendants Continental Incorporated, Inc. d/b/a/ Continental Enterprises ("Continental") and Leapers, Inc. ("Leapers").

grievances.  Here, Plaintiffs have sued Defendants for exercising these constitutional rights.  Leapers, through its agent Continental, petitioned the government for redress of its good faith belief that Plaintiffs were infringing upon its proprietary rights protected under Indiana law, namely markings and symbols of identification contained on its rifle scopes.  Indiana Code § 35-43-5-1, *An-Hung Yao v. Indiana*, 975 N.E.2d 1273, 1281 (Ind. 2012) Now, Plaintiffs allege injury as a result of these protected free speech activities, making claims against Defendants for defamation, malicious prosecution, abuse of process, conspiracy, and interference with prospective economic advantage.[3]  The Complaint is replete with allegations that are demonstrably and indisputably false.  Further, for the second time, Plaintiffs' claims are legally insufficient and cannot survive a Rule 12(b)(6) motion to dismiss.[4] Plaintiffs' goal in filing this lawsuit is to directly attack the Defendants' First Amendment rights and chill their right to petition the government.  Nevada's anti-SLAPP statute was enacted to prevent exactly this sort of lawsuit.

Defendants' communications to law enforcement fit within both the provisions of NRS 41.650 and 41.637, as well as Indiana's version, I.C. § 34-7-7-1 *et seq,* affording Defendants anti-SLAPP protection.[5] Therefore, to avoid dismissal of each of its state law claims in this case, Plaintiffs must "demonstrate[] with prima facie evidence a probability of prevailing on the claim."  NRS 41.660(3)(b). Plaintiffs cannot meet this burden for multiple reasons, as fully detailed in Defendants' Motion to Dismiss for Failure to State a Claim filed contemporaneously herewith. Consequently, the Court should grant this Motion and dismiss each of Plaintiffs' state law claims in their entirety and award

---

[3]     It should be noted that this is the Plaintiffs' second attempt to bring such a lawsuit against Defendants.  Their first complaint against Defendants, under a different cause number, based on the exact same set of facts was dismissed in its entirety by this Court on October 11, 2016 for failure to state a claim pursuant to Rule 12(b)(6). A true and correct copy of this Order is attached hereto as Exhibit A.

[4]     Contemporaneously with this motion, Defendants have again filed a Motion to Dismiss pursuant to Rule 12(b)(6) challenging the legal sufficiency of the claims.  However, this Court "can proceed directly to [this] anti-SLAPP motion without any interferences from a motion to dismiss." *Hilton v. Hallmark Cards,* 599 F3d 894, 901 (9th Cir. 2010).

[5]     Here, the majority of Plaintiffs' state law claims are governed by Nevada law, and therefore, the Nevada anti-SLAPP statute applies to those claims.  However, Indiana law would apply to Plaintiffs' claim for malicious prosecution, therefore, Indiana's anti-SLAPP law would apply to that claim.

Defendants reasonable attorneys' fees, costs and other proper relief in connection with bringing this motion, as authorized by NRS 41.670.

## II.   FACTUAL OVERVIEW.[6]

**The Business of Continental and Leapers** - Continental is a private intellectual property investigation firm located in Indianapolis, Indiana. (ECF No. 2 ¶ 11) Continental conducts investigations for clients who suspect their intellectual property rights are being violated. (*Id.* ¶ 12) Leapers is in the business of supplying hunting and shooting products, including rifle scopes. (*Id.* ¶¶ 10, 20) (Declaration of Karl Manders ("Manders Decl."), attached as Exhibit B, ¶4)  Leapers claims intellectual property rights in the markings and symbols of identification contained on its rifle scopes. (Declaration of Tina Ding ("Ding Decl."), attached as Exhibit C, ¶ 16)

**Continental's Investigation of Defendants and Subsequent Statements to Law Enforcement** - In or around August 2013, Leapers engaged the services of Continental Enterprises to investigate certain unauthorized sellers of rifle scopes that were identical to scopes sold by Leapers. (Ding Decl. ¶ 3)  Leapers suspected that these unauthorized scopes, sold under the SNIPER brand, were sourced through a former business associate of Leapers, Charlie Shi. (*Id.*) (Manders Decl. ¶ 6)  Prior to 2004, Leapers' scopes were contract-manufactured by the Jinkaijin factory in Shenzhen, China. (Ding Decl. ¶ 4)  In 2002, Leapers started to revamp the scope line and develop its unique scope appearance, aiming to create a signature scope impression. (*Id.*)  Models with these new designs went on sale in 2003 and have been prominently illustrated in Leapers' annual catalogs, as well as visibly advertised by Leapers' distributors in their marketing magazines and fliers before the internet came along. (*Id.*) As Leapers expanded, Jinkaijin had difficulty meeting Leapers' production and capacity requirements. (*Id.* ¶ 5) In 2004, Tina Ding ("Ding") formed Wuyang Sporting Goods Store ("Wuyang") in China in order to own a manufacturing entity that could directly support Leapers' requirements. (*Id.*)  Ding was the sole legal owner of Wuyang. (*Id.*)  Since Leapers' scope styles and features were well established, very distinctive and significantly different from those of other makers in China at the time, various

---

[6]    Although called a "motion to dismiss," anti-SLAPP motions are treated like motions for summary judgment. *See Davis v. Parks*, WL 1677659, at *2 (Nev. 2014).

Leapers' scope samples were sent to Wuyang to train the work force to achieve the distinctive style in form, fit and function.  (*Id.*)  Unless there was an exception from mutual agreement, Wuyang was to make scopes for Leapers exclusively.  (*Id.*)  Wuyang manufactured scopes for Leapers from 2004 until 2011, following the required distinctive designs already established by Leapers.  (*Id.* ¶ 6)  Leapers' scope models with these unique appearance designs have been on sale in both the U.S. and many foreign countries since 2003, and in many instances Leapers used those unique designs to serve as identifiers of Leapers' products.  (*Id.*)

Charlie Shi was a former employee of Wuyang and worked in the factory directing the manufacture of the Leapers scope.  (*Id.* ¶ 7)  In November, 2011, Leapers terminated its relationship with Wuyang, by email.  (*Id.* ¶ 8)  Shi responded to Leapers' email with his own task assignment instructions to three (3) different managers in Wuyang, asking them to mobilize factory personnel to cooperate with Leapers on all required tasks.  (*Id.* ¶ 9)  Shi asked them to complete all work without delay by the end of November 2011 and indicated anyone causing delay would get a penalty. (*Id.*)  Other managers also acknowledged the email.  (*Id.*)  After this communication, and despite Wang's email and Shi's apparent acceptance of its terms, Leapers became aware that Shi, through his company Trarms, Inc. d/b/a Presma, Inc. ("Trarms"), manufactured rifle scopes that were nearly identical to that of Leapers' intellectual property under the trade name SNIPER.  (*Id.* ¶ 10)  Because of this, in or around August 2013, Leapers engaged the services of Continental.  (*Id.* ¶ 11) (Manders Decl. ¶ 5)

Continental's investigation included, but was not limited to, client discussions, research into designs offered by other rifle scope manufacturers, physical comparison of Leapers' products against SNIPER products, purchases of SNIPER products for delivery into Indiana, and undercover interaction with Trarms' president, Charlie Shi. (Manders Decl. ¶ 6)  It was clear from a physical comparison of certain Leapers and SNIPER products, they were by and large identical. (*Id.*)  During the course of the investigation, Continental discovered that a company doing business under the name "Patriot Industry" was also offering Trarms SNIPER products for sale, sometimes under the brand name HALCYON. (*Id.* ¶ 7)  Continental learned that Patriot Industry involved two principals, Adrish Banerjee and Yan "Catherine" He.  (*Id.*) As part of the investigation, Continental purchased several rifle scopes from

Trarms and Plaintiffs bearing the SNIPER and HALCYON marks for examination.  (*Id.*  ¶ 8)

Upon completion of the investigation by Continental, and satisfied that the investigation revealed that Trarms and Shi were using without authorization Leapers' proprietary designs, Leapers authorized Continental to present the information learned through its investigation to law enforcement. (Ding Decl. ¶¶ 11, 12)  It was authorized to do so by Leapers, and to petition government on Leapers' behalf to redress the wrong that Leapers saw happening in the marketplace.  (*Id.*  ¶ 12)

***The Criminal Proceedings of Shi -*** Upon completing the investigation into Trarms and Shi, Continental, as Leapers' agent, reported the results of its investigation to Detective Robert Wies of the Vanderburgh County police department. (Manders Decl. ¶ 9)[7]   Detective Wies took the information Continental provided and evaluated it independently.  *Id.*

Detective Wies is a current officer within the Financial Crimes Division of the Evansville Police Department.  (Wies Dep., p. 13:2-6)  Before this investigation he had never known or worked with any individuals affiliated with Defendants.  (*Id.* at p. 74:16-18)  Detective Wies independently evaluated the scopes on two occasions.  (*Id.* at p. 71: 1-15) He believed that Leapers' complaint had merit and made an independent determination to investigate Leapers' claims of counterfeiting.  (*Id.* at pp. 72:17-23, 76:25-77:3)  During his investigation, Detective Wies worked with Leapers, the alleged victim of the counterfeiting, which was his typical practice in investigations.  (*Id.* at pp. 58:25-59:1)  After conducting his investigation, Detective Wies made an independent determination there was probable cause for Shi's arrest for the violation of several Indiana criminal statutes.  (*Id.* at p. 72:17-23)

Prosecutor Malcolm Gwinn worked with Detective Wies on the Shi matter.[8] (Gwinn Dep. p. 13:8-16)   Before this case, Prosecutor Gwinn had never met or worked with anyone at either Leapers or Continental.  (*Id* at p. 82:8-24); (Manders Decl. ¶13); (Ding Decl. ¶14) During the investigation and prosecution, the victims of the crime, here the owners of Leapers, Tina and David Ding, have very

---

[7]     Excerpts from Detective Wies' deposition taken in a different but related proceeding are attached hereto as Exhibit D.

[8]     Excerpts from Prosecutor Gwinn's deposition taken in a different but related proceeding are attached hereto as Exhibit E.

little control over the process. (Gwinn Dep. p. 71:9-22).   In this particular case, Leapers, alone or through Continental, had no control over decisions of law enforcement or the prosecutor's office. (*Id.*)

Upon completion of the investigation and having satisfied himself that Shi had committed a crime, Detective Wies signed and submitted a probable cause affidavit[9], prepared by Prosecutor Gwinn, to the Vanderburgh County Superior Court and an arrest warrant was issued.   (Wies Dep. p 72:17-23) (Manders Decl. ¶10) At all times during the investigation and prosecution of Shi and Trarms, both Leapers and Continental cooperated with Detective Wies and Prosecutor Gwinn. (Wies Dep. p. 68:7-10) (Gwinn Dep. p. 80:18-22) (Manders Decl. ¶16) At no time did Defendants attempt to influence or persuade either to seek an arrest warrant. (Wies Dep. p. 74:4-6) (Ding Decl. ¶15) (Manders Decl. ¶¶14, 15, 17) Defendants never commanded that Detective Wies or the Prosecutor Gwinn take any actions. (Wies Dep. pp. 72:24-25, 73:1-6) (Gwinn Dep. p. 81:5-12) (Ding Decl. ¶15); (Manders Decl. ¶14) The Defendants deferred to their authority in the case. (Wies Dep. pp. 68:25, 69:1-4) (Gwinn Dep. pp. 80:23-25, 81:1-4)

***The Criminal Proceedings of Plaintiffs -*** Upon completing the investigation into Patriot Industry, Banerjee and He, Continental, as Leapers' agent, reported the results of its investigation to Sheriff Joe Beckwith of the Vanderburgh County Sheriff's Department. (Manders Decl. ¶11) Sheriff Beckwith[10] took the information Continental provided and evaluated it independently. (*Id.* at ¶12); Continental made no attempt to influence or control his review or decisions concerning Continental's investigation or the activities of Patriot Industry, Banerjee and He. (*Id.* at ¶14)

Sheriff Beckwith independently evaluated the scopes.   (*Id.* at ¶ 11).   Before this case, Sheriff Beckwith had never met or worked with anyone at either Leapers or Continental.  (*Id.* at ¶ 13) (Ding Decl. ¶ 14)

Sheriff Beckwith determined that probable cause existed that Plaintiffs, Banerjee and He, violated several Indiana criminal statutes.[11]   After being presented with a sworn probable cause affidavit, the

---

[9]     A true and correct copy of this affidavit is attached hereto as Exhibit F.
[10]     Sherriff Beckwith has not yet been deposed in any proceeding, but there is no reason to believe that his testimony would be any different than what Detective Wies testified to already, because there is no truth to the suggestion that he was influenced or controlled by Continental and/or Leapers.
[11]     A true and correct copies of these affidavit are attached hereto as Exhibits G and H.

Vanderburgh Superior Court issued warrants for the arrest of both Plaintiffs on or about December 5, 2014. (Exs. G and H)  Defendants did not have the ability to influence or persuade Prosecutor Gwinn to take any actions in a case.   (Manders Decl. ¶14); (Ding Decl. ¶13) (Gwinn Dep. p. 82:4-7) The decisions regarding prosecution are reserved solely for the prosecutor. (Gwinn Dep. p. 82:4-7)

*Plaintiffs file their first lawsuit against Defendants which is quickly dismissed* - On February 24, 2016, Plaintiffs filed a complaint against Continental, Leapers, and Does 1-10 in Clark County District Court of Nevada based on Defendants' constitutionally protected activities in reporting to the governmental authorities what they believed to be a counterfeiting. On March 28, 2016, Continental and Leapers removed the case to this federal court. Plaintiffs filed an amended complaint on May 9, 2016. alleging fourteen causes of action: (1) constitutional rights violation under 42 U.S.C. § 1983; (2) abuse of process; (3) false imprisonment; (4) defamation; (5) intentional infliction of emotional distress; (6) civil conspiracy; (7) negligence; (8) malicious prosecution under 42 U.S.C. § 1983; (9) malicious prosecution under common law; (10) Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. § 1964; (11) RICO under NRS 207.470; (12) tortious placing in false light; (13) interference with prospective economic advantage; and (14) *respondeat superior* liability of Leapers. (A copy of this complaint is attached at Exhibit I)   On October 11, 2016, this Court granted Continental and Leapers' motion to dismiss and further ordered that plaintiffs' amended complaint be dismissed without prejudice. (Ex. A)

*Plaintiffs file the instant and second lawsuit against Defendants* - On February 13, 2017, Plaintiffs filed the instant Complaint in an attempt to breathe new life into claims already dismissed once by this Court. (ECF No. 2) The present suit is no different from Plaintiffs' previous failed action, except that it reduced the fourteen dismissed causes of action to ten slightly renamed claims: (1) Interference with prospective economic advantage, (2) Antitrust pursuant to 15 U.S.C. §§ 1 and 15, (3) Antitrust pursuant to NRS 598A.210, (4) Defamation, (5) False Light, (6) False Arrest and Imprisonment, (7) Malicious Prosecution, (8) 42 U.S.C.  § 1983 (color of law), (9) Civil Conspiracy, and (10) Negligence. These "new" allegations suffer from the same inadequacies as Plaintiffs' prior claims.

### III.   LEGAL ARGUMENTS.

**A.   Defendants are Immune from Liability Under Nevada's Anti-SLAPP Statute.[12]**

    1.   <u>The Purpose and Broad Scope of the Statue.</u>

    In 1993, Nevada enacted anti-SLAPP legislation for the express purpose of curtailing Strategic Lawsuits Against Public Policy ("SLAPP") – "'meritless suit[s] filed primarily to chill the defendant's exercise of First Amendment rights.'" *John v. Douglas Cty. Sch. Dist.*, 219 P.3d 1276, 1280 (Nev. 2009); *see also Metabolic Research, Inc. v. Ferrell*, 693 F.3d 795, 800 (9th Cir. 2012) (purpose of permitting dismissal of meritless claims under the anti-SLAPP statute is to eliminate chilling the valid exercise of freedom of speech and the right to petition the government in matters of public interest). "Nevada's anti-SLAPP statute filters unmeritorious claims in an effort to protect citizens from costly retaliatory lawsuits arising from their right to free speech under both the Nevada and Federal Constitutions." *John*, 219 P.3d at 1282.   Courts and the legislature recognize that without anti-SLAPP protection, "unscrupulous lawyers and litigants will be encouraged to use meritless lawsuits to discourage the exercise of first amendment rights." *Metabolic Research*, 693 F.3d at 800.

    To prevent SLAPP lawsuits, the Nevada statute provides "immunity from any civil action" for "good faith communication[s]" related to certain types of speech addressing "an issue of public concern."   NRS 41.650. Here, this action was instituted by Plaintiffs in retaliation for Defendants exercising their First Amendment rights in reporting Plaintiffs' alleged counterfeiting activities to the police and prosecutor.   As demonstrated, *infra*, such a lawsuit is properly dismissed under Nevada's anti-SLAPP statute.

    2.   <u>Procedure Under the Anti-SLAPP Statute</u>

    To assert statutory immunity under the Anti-SLAPP statute, the "person against whom the

---

[12]   The 9th Circuit has explicitly held that the federal court may apply anti-SLAPP statutes. *See Verizon Delaware, Inc. v. Covad Commc'n Co.,* 377 F.3d 1081, 1091 (9th Cir.2004) ("[D]efendants sued in federal courts can bring anti-SLAPP motions to strike state law claims."); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.,* 190 F.3d 963, 973 (9th Cir.1999); *see also Metabolic Research, Inc. v. Ferrell,* 693 F.3d 795 (9th Cir.2012).   Further, the 9th Circuit has accorded federal-court defendants the full procedural advantages of anti-SLAPP laws.   *Batzel v. Smith*, 133 F.3d 1018, 1024-26 (9th Cir. 2003).

action is brought may file a special motion to dismiss…[within] 60 days after service of the complaint."[13] *Id*. § 41.660. The defendant bears the initial burden to show by prima facie evidence two things: (1) the "communication [was made] in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern…", and (2) that it constituted a "good faith communication" which means the statement is either "truthful or is made without knowledge of its falsehood. NRS 41.660, *see also John*, 219 P.3d at 1282. Where that burden is met, the plaintiff can avoid dismissal only by demonstrating with evidence a probability of prevailing on the claim.  *Id.* This burden "falls somewhere in below the "clear and convincing/high probability' standard and above the 'summary judgment/triable issue of fact' standard."  *Id.*; *see also Makaeff v. Trump University, LLC,* 715 F.3d 254, 274 (9th Cir. 2013) (after an anti-SLAPP movant has met its burden, the California statute shifts the burden back to the plaintiff and requires a plaintiff "to show a 'reasonable probability' that he will prevail, rather than merely a triable issue of fact") (Kozinski, CJ) (concurring opinion).

If the plaintiff is unable to meet its burden, the court "must dismiss the action and that dismissal operates as an adjudication upon the merits" *Id.*  Further, upon dismissal, the statute provides for an award of reasonable costs and attorney's fees, as well as discretionary punitive damages and a statutory award up to $10,000 to the moving party.  NRS 41.670.

3. The Challenged Statements Were Made "in Furtherance of the Right to Petition" Connected with an Issue of "Public Concern."

Nevada's anti-SLAPP statute defines the types of communications that are protected as furthering the right to petition or to free speech: (1) a "[c]ommunication that is aimed at procuring any governmental or electoral action, result or outcome;" (2) a "[c]ommunication of information or a complaint to a Legislator, officer or employee of the Federal Government, this state or a political subdivision of this state, regarding a matter reasonably of concern to the respective governmental entity;" (3) a "[w]ritten or oral statement made in direct connection with an issue under consideration

---

[13]     Upon the filing of the anti-SLAPP motion, the Court must rule on the motion within 20 judicial days after the motion is served upon the plaintiff.  *Id.*

by a legislative, executive or judicial body, or any other official proceeding authorized by law;" and (4) a "[c]ommunications made in direct connection with an issue of public interest in a place open to the public or in a public forum." NRS 41.637. "The critical point is whether the plaintiff's cause of action was itself *based on* an act in furtherance of the defendant's right of petition." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) (internal quotation omitted).

Applied here, Defendants' actions fall squarely under definitions 2 and 3. As Plaintiffs themselves allege, the claims asserted against Defendants are the result of Defendants reporting Plaintiffs' possible criminal activity to law enforcement to procure a government investigation, and thereafter communicated with law enforcement during the course of that investigation. Reporting suspected criminal activity to law enforcement falls within the ambit of Nevada's anti-SLAPP statute. *See Lawrence v. Krahne*, No. 66595, 2015 WL 5545555, at *1 (Nev. App. Sept. 16, 2015) (holding "statements to the police [that] were made in good faith and meant to procure governmental action in the form of an investigation" are protected under the anti-SLAPP statute). In *Lawrence*, the Nevada Court of Appeals affirmed the district court's decision to grant two special motion to dismiss under Nevada's anti-SLAPP statute, in addition to a motion to dismiss for failure to state a claim, where the defendants made statements to law enforcement officers concerning the plaintiff's possible illegal conduct. The district court concluded the defendants "met their initial burden because their statements to the police were made in good faith and meant to procure governmental action in the form of an investigation of [the plaintiff's conduct]." *Id.*[14]

*Dickens v. Provident Life and Acc. Ins. Co.*, 117 Cal. App. 4th 705, 708 (2004), a case cited by the Nevada Supreme Court as authoritative law on the proper application of Nevada's anti-SLAPP statute[15], is also instructive on this point. *Dickens* involved a claim against an insurance company and

---

[14]     *See also Haack v. City of Carson City*, 2012 WL 3638767, at *3 (D. Nev. Aug. 22, 2012) ("The Nevada Supreme Court has expressly held that [NRS 41.637(3)] apply to cases…where the conduct in question related to an investigation of alleged wrongful action…."); *Panicaro v. Crowley*, 2017 WL 253581, at *1 (Nev. App. Jan. 5, 2017) (holding communication made in the course of filing a complaint with the State Bar of Nevada were protected under the anti-SLAPP statute); *Siam v. Kizilbash*, 31 Cal.Rptr.3d 368, 373–74 (Ct.App.2005) (explaining statements "designed to prompt action by law enforcement" were protected under California's anti-SLAPP statute).

[15]     *See John*, 219 P.3d at 1280.

its investigator alleging they initiated an improper criminal prosecution of the plaintiff by the federal government. The plaintiff in *Dickens* asserted operative facts similar to those asserted by Plaintiffs here, alleging:

> Under the direction of [the defendant insurance company], [the defendant insurance investigator] knowingly and willingly initiated an unwarranted and biased investigation of [plaintiff] in connection with allegations of fraudulently filed monthly claims. [Defendants] knew the results of the investigation would be submitted to federal authorities to prosecute [plaintiff]. The investigation provided no evidence of any criminal wrong doing by [plaintiff] but [Defendants] nonetheless submitted the information to the United States Attorney and used their connections in that office to initiate the prosecution. The indictment was based on the false and incomplete information and testimony provided by [Defendants]. [Defendants] had contact with certain prosecution witnesses to discuss and possibly influenced their testimony prior to their testifying at [plaintiff's] trial. The prosecution of the case was personally supervised by a former FBI agent who is now employed at [the defendant insurance company] and came to the trial every day and worked hand and foot [sic] with the U.S. Attorney. [Defendants] acted without probable cause in that they did not honestly, reasonably and in good faith believe [plaintiff] to be guilty of the crime charged….

*Id.* at 709. The district court dismissed the plaintiff's complaint and the California Court of Appeals affirmed, reasoning the defendants' contact with the federal authorities was "within the ambit of the [anti-SLAPP] statute. It was contact with the executive branch of government and its investigators about a potential violation of law. The contact was preparatory to commencing an official proceeding authorized by law: a criminal prosecution for mail fraud." *Id.* at 714. This was so, even though the plaintiff was ultimately acquitted of all charges. *Id.* at 707.

Here, Plaintiffs complain of Defendants' actions in contacting the police and prosecutors, reporting a potential violation of the law, and communication in preparation to the government's commencing an official proceeding authorized by law: criminal prosecution for forgery, theft, and conversion. Accordingly, the Defendants' communications with law enforcement and the prosecutor constitute statements in "direct connection with an issue of public concern."

        4.    <u>The Challenged Statements Were Made in Good Faith.</u>

A communication is "made in good faith" if it is "truthful or is made without knowledge of its falsehood." NRS 41.637(3). Plaintiffs' Complaint against Defendants challenges Leapers' (through its agent Continental) protected speech where it reported what it believed to be a crime, infringement

of the markings and symbols of identification contained on its scopes.  These communications are both good faith communications made in furtherance of Leapers' First Amendment right of free speech and communications to seek redress from the government.  As such, they are immune under the Nevada anti-SLAPP statute, and any claims against Defendants based on those communications must be dismissed.

> a.    *Indiana Law on Markings and Symbols of Identification.*

Plaintiffs' complain of Defendants' communications to police and the prosecutors as false, alleging that Defendants claimed trademark and/or trade dress rights in the scopes and that Leapers does not have these rights.  Plaintiffs go so far as to allege that Defendants "knew" they did not have trademark rights in the scopes and lied to law enforcement about this fact. (ECF No. 2, ¶¶ 32-34)  This is demonstrably false.  Defendants never alleged to police or prosecutors that Leapers was the owner of either trademark or trade dress rights. In fact, the probable cause affidavit for all three arrests, authored by the prosecutor, signed by the police, and relied upon by the judge, made reference only to "markings and objects or symbols of identification." (Exs. F, G, H)  This is because Defendants only claimed ownership of rights related to the "markings and objects or symbols of identification" on the scopes – unique rights protected exclusively under Indiana state law.

Indiana's definition of "property" means "anything of value" including "intangibles." *An-Hung Yao*, 975 N.E.2d at 1281.  In *An-Hung Yao*, the Indiana Supreme Court ruled that intellectual property – including markings or objects or symbols of value, right, privilege, or identification – is included in Indiana's definition of "property" and is, therefore, subject to theft and conversion because it can be encumbered. *Id.* at 1281-82. In addition, the court ruled that markings, or "other objects or symbols of value, right, privilege, or identification" are written instruments, and, therefore, are protectable under Indiana's criminal theft, conversion, forgery, and counterfeiting statutes.  *Id.* at 1278-1281; *see also Jacobs v. State*, 640 N.E.2d 61, 65 (Ind. Ct. App. 1994). Thus, the unauthorized sale of any such marking or symbol constitutes theft, conversion, forgery, and counterfeiting, and the seller could be in violation of Indiana law, irrespective of civil trademark law.  *An-Hung Yao*, 975 N.E.2d at 1278-1281.

A person or entity may have a proprietary interest in markings and symbols of identification that are separate and different from trademark rights. *See Leapers, Inc. v. Trarms, Inc.*, 203 F. Supp. 3d 969, 972 (S.D. Ind. 2016).  In *Leapers*, Leapers filed claims against Trarms and others alleging civil claims for theft, conversion, forgery, counterfeiting, and criminal mischief for unlawfully selling rifle scopes bearing Leapers' markings of identification (*i.e.* the exact allegations advanced in the criminal investigation of Plaintiffs).[16] Trarms filed a motion to dismiss Leapers' complaint, alleging the underlying Indiana criminal statutes were "inapplicable to the facts of this case…." *Id.* at 973. The Court denied Trarms' motion, holding:

> Our decision is limited to determining whether [Leapers] has stated a claim for Conversion [] Forgery[, Theft, Conversion, and Criminal Mischief] under Indiana law. In light of the expansive language of these provisions in the criminal code and the Indiana Supreme Court's decision in *Yao*, it is clear that [Leapers] has satisfied that requirement. A rifle's scope, much like the rifle itself, may represent a written instrument under applicable law and may therefore be subject to [criminal and civil liability].

*Id.* at 974.   The relevant Indiana criminal statutes prohibit "a very wide range of activity" with regard to misappropriation of intellectual property, not simply trademark infringement. *An-Hung Yao*, 975 N.E.2d at 1281; *Leapers,* 203 F. Supp. 3d at 972. Indiana law supports Defendants' theory of Plaintiffs' (and Shi's) alleged forgery of the markings and symbols of identification as a separate and actionable cause of action.   Therefore, where Defendants reported to police and the prosecutor a potential violation of this law, they had a good faith basis for doing so.   The law supported those claims.

       b.    *The Challenged Statements Were Truthful or Made Without Knowledge of Their Falsehood.*

Notwithstanding the law in Indiana supporting Defendants' belief of an alleged forgery of the scopes, the challenged communications made by Defendants were truthful or made without knowledge of their falsehood as Leapers at all times believed, and continues to believe, it is the owner of the unique rifle scope designs, including their unique markings, at issue in this matter.   Further,

---

[16]     These claims, after surviving a Rule 12(b)(6) motion to dismiss, remain pending in the Southern District of Indiana.

Continental had no reason to believe that Leapers is not the owner of the rifle scope designs where its investigation suggested that Leapers did in fact own the markings and symbols of identification.

In 2004, Tina Ding formed Wuyang Sporting Goods Company ("Wuyang") in order to own a manufacturing entity that directly supported Leapers' requirements.  (Ding Decl. ¶ 5) Throughout that time of 2004 to 2011, Leapers scopes were unique in the marketplace in their design, and in many instances Leapers used those unique designs to serve as identifiers of Leapers' products.  (*Id*. at ¶ ¶ 5, 6)

Charlie Shi was a former employee of Wuyang and worked in the factory assisting with the manufacture of the Leapers scopes.  (*Id*. at ¶ 7)  In November, 2011, Tina terminated Leapers' relationship with Wuyang.  (*Id*. at ¶ 8)  By email, Leapers' employee Eric Wang instructed Shi and others at Wuyang the following:

- all remaining unfulfilled orders to the factory were canceled;
- they were to immediately cease using any and all technical specifications and product and packaging design documents related to any Leapers products and they should be destroyed;
- they were to destroy any spare parts manufactured in the past to fulfill Leapers' orders;
- they were to not disclose any product or packaging designs, or technical specifications, to anyone outside of Wuyang;
-  and Leapers trademark logos, symbols and design marks were protected by intellectual property laws.

(*Id*.) Shi responded to Leapers' email with his own task assignment instructions to 3 different managers in Wuyang and to complete all work by November 11. (*Id*. at ¶ 9) After this communication, and despite Mr. Wang's email and Shi's apparent acceptance of its terms, Leapers became aware that Shi, through his company Trarms, Inc. d/b/a Presma, Inc. ("Trarms"), manufactured rifle scopes that were nearly identical to that of Leapers' intellectual property under the trade name SNIPER.  (*Id*. at ¶ 10)

Leapers contacted Continental in or around 2013 to investigate suspected infringement of Leapers' claimed proprietary rights in and to rifle scopes offered for sale by Trarms under the SNIPER

brand name. (Ding Decl. ¶ 10) (Manders Decl. ¶ 5) It was clear from a physical comparison of certain Leapers and SNIPER products, they were by and large identical. (Manders Decl. ¶ 6) During the course of the investigation, Continental discovered that a company doing business under the name "Patriot Industry" was also offering Trarms SNIPER products for sale, sometimes under the brand name HALCYON.  (*Id*. at ¶ 7) It learned that Patriot Industry involved two principals, Adrish Banerjee and Yan "Catherine" He.  Continentals' investigators met with them in person, and they identified themselves as a manufacturer of both the SNIPER and HALCYON scopes.  (*Id*.)

As part of the investigation, Continental purchased several rifle scopes from Trarms and Plaintiffs bearing the SNIPER and HALCYON marks for examination. (*Id*. at ¶ 8) Upon completing the investigation into Trarms and Shi, Continental, as Leapers' agent, reported the results of the investigation to Detective Robert Wies of the Vanderburgh County police department.  (*Id*. at ¶ 9) Detective Wies took the information Continental provided and evaluated it. (Wies Dep. pp. 67:21-68:6)

After Detective Wies's evaluation, and in consultation with an assistant prosecutor in Vanderburgh County, Indiana, Malcolm Gwinn, Detective Wies executed a probable cause affidavit against Charlie Shi for his criminal activities in illegally copying Leapers' proprietary rifle scope designs and offering them for sale in the State of Indiana. (*Id*. at. p. 72:17-23)  Based on that affidavit, the court issued an arrest warrant for Shi.

Upon completing the investigation into Patriot Industry, Banerjee and He, Continental, as Leapers' agent, reported the results of its investigation information to Sheriff Joe Beckwith of the Vanderburgh County Sheriff's Department. (Manders Decl. ¶ 11)   Sheriff Beckwith took the information Continental provided and evaluated it. There was never any discussion with any Vanderburgh law enforcement officer or government lawyer, including any of Detective Wies, Sheriff Beckwith and Malcolm Gwinn, to intentionally violate Banerjee or He's rights. (*Id*. at ¶ ¶ 16, 17) Here, at all times, Defendants' statements to the police "were made in good faith and meant to procure governmental action in the form of an investigation." *Lawrence*, 2015 WL 5545555, at *1.

Defendants have met their burden to prove the statements were either true or made without knowledge of their falsehood where both parties believed Leapers to be the owner of the markings and symbols of identification, and where Indiana law protects such rights, even in the absence of trademark or trade dress rights.

5.     Plaintiffs Cannot Meet Their Burden to Prove a Probability of Success on Their Claims.

Because Defendants have shown that Plaintiffs' state law claims are based on Defendants' protected activity, the burden now shifts to Plaintiffs to provide evidence demonstrating a probability of prevailing on the claims. *Wilson v. Perfect Privacy, LLC*, 2016 WL 7985296 (Nev. Dist. Ct.). This burden "falls somewhere in below the "clear and convincing/high probability' standard and above the 'summary judgment/triable issue of fact' standard." *Id.* When proving a probability of prevailing on its claim, the plaintiffs cannot rest on broad, unsupported allegations or conclusory statements and, instead, must plead a substantiated, legally sufficient claim. *Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 140 Cal. App. 4th 515, 527 (2006); *Roberts v. Los Angeles Cty. Bar Assn.*, 105 Cal. App. 4th 604 (2003). Put another way, Plaintiffs "must demonstrate that the complaint is both legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by [Plaintiffs] is credited." *Fitzgibbons*, 140 Cal. App. 4th at 527.   A plaintiff may not respond to a special motion to dismiss merely by "present[ing] a narrative disagreement with the moving party" – the plaintiff is required to provide evidence in support of its burden. *John v. Douglas Cty. Sch. Dist.*, 219 P.3d 1276, 1287 (Nev. 2009).

a.     *Plaintiffs' Factual Allegations of Defendants' Actions are Demonstrably False.*

Plaintiffs' claims against Defendants as issue in this Motion are based on Plaintiffs' demonstrably false allegations that Defendants had a "special relationship" with the prosecutor who criminally charged the Plaintiffs (ECF No. 2, ¶ 121), that Defendants were improperly intertwined with the sheriff's office and the prosecutor (*Id.* at ¶ 147), and that Defendants were the "but for cause" of Plaintiffs' arrests (*Id.* at ¶ 123). These allegations are essential elements in support of Plaintiffs' claims at issue in this motion.

While Plaintiffs make allegations against Defendants of nefarious acts of collusion with the police and prosecutor concerning the arrests of not only Plaintiffs, but also Shi, those allegations are demonstrably false.

i.      Investigation and Prosecution of Shi.

The Shi investigation moved forward at the direction of Detective Robert Wies of the Vanderburgh Police Department. Detective Wies is a veteran of the force who handles investigations of crimes in the financial unit of the department, and who regularly works with victims of these crimes. (Wies Dep. p. 13:2-13)  Detective Wies works with a prosecutor during his investigations and assists the prosecutor in determining whether charges should be brought. (Wies Dep. p. 64:19-25, 65:1-2) Victims do not decide whether charges should be brought; the prosecutor decides.  (*Id.*)

This case proceeded no different than any of Detective Wies' cases.

- Detective Wies worked with Leapers, as he would any victim, and Continental to investigate the alleged counterfeiting by Shi;
- Detective Wies had no prior relationship with either and has not worked with either since this investigation;
- Both Leapers and Continental deferred to his authority and never commanded he do anything in the investigation;
- Continental, as Leapers' agent, never informed Detective Wies that Leapers owned trademark or trade dress rights in the design of the scope.  Rather, Leapers claimed ownership of rights related to the markings or symbols of identification on the scopes.

(*Id.* at p. 57-59, 67, 73-74) (Ex. F) And, again in the regular course of business, the prosecution of Charlie Shi was handled by prosecutor Malcolm Gwinn.  In this case, the Dings (the owners of Leapers) had no control over the process while he was handling the prosecution. (Gwinn Dep. p. 71:9-22) His prosecution was independent from both Continental and Leapers and he exercised the same amount of independent discretion in this case than in any other he has handled.  (*Id.* p. 82:4-7, 25, 83:1-3) At no time did Defendants influence his decision to prosecute Shi.  (*Id.* at p. 86:2-7)

ii.      Investigation and Prosecution of Plaintiffs

Sheriff Joe Beckwith conducted the investigation into the alleged counterfeiting by Plaintiffs. Continental, as agent for Leapers, reported to Sheriff Beckwith the information it discovered during its

investigation of Plaintiffs.   (Manders Decl. ¶ 11)   Before this case, Continental did not have a relationship with Sheriff Beckwith and its president, Karl Manders, had never met Sheriff Beckwith. (*Id*. at ¶ 13)   Prosecutor Gwinn also handled the prosecution of Plaintiffs.   (*Id*. at ¶ 14) During the investigation, Continental cooperated with Sheriff Beckwith and Prosecutor Gwinn and deferred to their authority.   (*Id*. at ¶ 14) Continental, as Leapers' agent, never informed Detective Wies that Leapers owned trademark or trade dress rights in the design of the scope.   (Exs. F, G, H)  Rather, Leapers claimed ownership of rights related to the markings or symbols of identification on the scopes. At no time did Continental attempt to influence or persuade either Sheriff Beckwith or Prosecutor Gwinn to seek an arrest warrant of Plaintiffs and deferred to Prosecutor Gwinn's authority at all times in this case.  (Manders Decl. at ¶ 14)

iii.    Because the Sheriff and the Prosecutor Acted Independently of Defendants, Plaintiffs Cannot Demonstrate a Probability of Prevailing.

In light of the facts here, each of Plaintiffs' state law claims referenced above fails.   In *Lawrence*, 2015 WL 5545555, the court affirmed the decision to grant two anti-SLAPP motions where defendants made statements to law enforcement regarding plaintiff's possible illegal conduct.   The court was unpersuaded by plaintiff's unfounded claims that the defendants' statements were untrue, and "concluded [the plaintiff's] unsupported allegations that the [defendants] committed fraud during a criminal investigation failed to show that there was a genuine issue of material fact or that he had a reasonable likelihood of success on the merits." Id. citing *Wood v. Safeway, Inc.*, 121 P.3d 1026, 1030-31 (2005) (stating general allegations and conclusory statements do not create genuine issues of fact). Here, the Court should also be unpersuaded by Plaintiffs' unfounded claims.

Plaintiffs repeatedly allege that Defendants caused Plaintiffs to be charged, arrested, and incarcerated. (ECF No. 2, ¶¶ 17, 44), They rely on these allegations to support essential elements of their claims for interference with prospective economic advantage (ECF No. 2, ¶ 86 – Defamation (alleging Defendants' actions were the but for cause of Plaintiffs' arrests and the public location of the arrests)); (ECF No. 2, ¶¶  106-107 – False Light (alleging Defendants' actions were the but for cause of Plaintiffs' arrests and the public location of the arrests)); (ECF No. 2, at ¶ 112 – False Arrest and

Imprisonment (alleging Defendants caused Plaintiffs' arrests)); (ECF No. 2, at ¶¶  117, 120-123 – Civil Conspiracy (alleging that charges were filed without independent evaluation of claims by state, alleging special relationship, alleging but for the actions of Defendants, Plaintiffs would not have been arrested and detained)); (ECF No. 2, at ¶ 156 (generally incorporating all tortious behavior alleged)); (ECF No. 2, at ¶¶  164-165 – Negligence (alleging that Defendants caused the arrest of Plaintiffs)). Yet all of these statements are directly contradicted by the testimony of the state actors themselves, as well as the official court documents related to the criminal proceedings.  Because Plaintiffs cannot prove that Defendants controlled and/or acted in concert with the sheriff and prosecutor, its claims cannot prevail.

b.    *Plaintiffs' Claims are Legally Insufficient.*

Plaintiffs cannot demonstrate a probability of prevailing on its state law claims here because each of these claims is legally insufficient and subject to dismissal under Rule 12(b)(6).  To that point, Defendants have filed contemporaneously with this motion a Motion to Dismiss under Rule 12(b)(6) and incorporate each of those arguments herein by reference.  Because Plaintiffs fail to plead legally sufficient claims against Defendants, the state law claims must be dismissed.

**B.    Defendants are Immune from Liability for Malicious Prosecution Under Indiana's Anti-SLAPP Statute.[17]**

Indiana's anti-SLAPP statute — like Nevada's — entitles the movant to dismissal of an action and affords an opportunity to "reduce the number of lawsuits brought primarily to chill the valid exercise of constitutional rights of freedom of speech and petition for the redress of grievances." *Brandom v. Coupled Prod., LLC*, 975 N.E.2d 382, 385 (Ind. Ct. App. 2012). Such lawsuits are "meritless [and] aimed at silencing a plaintiff's opponents, or at least diverting their resources."

---

[17]    Under this Section, Defendants seek dismissal of Plaintiffs' claims for malicious prosecution which shall be governed by Indiana law.  Under Nevada choice-of-law principles, Section 155 of the Second Restatement applies to malicious prosecution claims and provides that "the local law of the state where the proceeding complained of occurred" governs. Restatement (Second) Conflict of Laws, § 155.  *See Flynn v. Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP*, 2010 WL 4339368, *2 (D. Nev. 2010).    Here, the proceeding – namely, the criminal prosecution against Plaintiffs – was pending in Indiana.  As such, Indiana law applies to this claim.

*Hamilton v. Prewett*, 860 N.E.2d 1234, 1241 (Ind. Ct. App. 2007) (internal citation omitted). Plaintiffs' malicious prosecution claim warrants dismissal under Indiana's anti-SLAPP.

  1.  <u>Procedure Under the Indiana Anti-SLAPP Statute</u>

  The Indiana anti-SLAPP statute provides a "defense in a civil action against a person that the act or omission complained of is: (1) an act or omission of that person in furtherance of the person's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Indiana in connection with a public issue; and (2) an act or omission taken in good faith and with a reasonable basis in law and fact." Ind. Code § 34–7–7–5. The public issue or issue of public interest that prompted the "act in furtherance of the person's constitutional right of petition or free speech" must be stated with specificity. *Brandom v. Coupled Products, LLC*, 975 N.E.2d 382, 385 (Ind. Ct. App. 2012) (citing Ind. Code § 34-7-7-9). The motion to dismiss "shall be granted if the court finds that the person filing the motion has proven, by a preponderance of the evidence, that the act upon which the claim is based is a lawful act in furtherance of the person's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Indiana." Ind. Code § 34-7-7-9. "A prevailing defendant on a motion to dismiss . . . is entitled to recover reasonable attorney's fees and costs." Ind. Code § 34-7-7-7.

  2.  <u>Standard of Review of a Motion to Dismiss Under Indiana's anti-SLAPP Statute</u>

  A motion to dismiss pursuant to Indiana's anti-SLAPP statute is deemed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. *Kadambi v. Express Scripts, Inc.*, 86 F.Supp.3d 900, 907 (N.D. Ind. 2015). As such, the motion should be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* The nonmoving party must then "go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986). In making its decision, the Court must view the evidence in the light most favorable to the nonmoving party, and without making any credibility determinations. *Zetwick v. County of Yolo*, 850 F.3d 436 (9th Cir. 2017).

  3.  <u>Defendants' Good Faith Report of Criminal Activity to Law Enforcement Was an Act</u>

<u>Made in Furtherance of Their Free Speech Rights on a Public Issue or an Issue of Public Concern</u>

It is evident here that Defendants' report to law enforcement was an act in furtherance of their free speech rights on a public issue or of public interest.

     a.    *Leapers' and Continental's Report of Criminal Activity is Speech on a Matter of Public Concern in Connection with a Public Issue*

"Speech is on a matter of public concern if it is addressed to 'any matter of political, social, or other concern to the community,' as determined by its content, form, and context." *Brandom v. Coupled Products, LLC*, 975 N.E.2d 382 (Ind. Ct. App. 2012). Indiana courts have noted, with approval, California's analysis on the subject. In that light, California courts have recognized three categories of statements that are entitled to anti-SLAPP protection:

(1) cases where the statement or activity precipitating the underlying cause of action was 'a person or entity in the public eye';

(2) cases where the statement or activity precipitating the underlying cause of action 'involved conduct that could affect large numbers of people beyond the direct participants'; and

(3) cases where the statement or activity precipitating the claim involved 'a topic of widespread, public interest.

*Kadambi v. Express Scripts, Inc*., 86 F.Supp.3d 900, 907 (N.D. Ind. 2005) (internal citations omitted). Further, the provisions must be "construed broadly' to safeguard 'the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" *Brandom v. Coupled Products, LLC*, 975 N.E.2d 382 (Ind. Ct. App. 2012) (quoting *Nygard, Inc. v. Uusi-Kerttula*, 72 Cal.Rptr.3d 210 (Cal. Ct. App. 2008)). Turning further to California law, it is clear that communications to the police are within the anti-SLAPP statute. *See Comstock v. Aber*, 212 Cal. App. 4th 931, 151 Cal.Rptr.3d 589 (2012) (citing *Walker v. Kiousis* 93 Cal. App. 4th 1432 (2001)).

In this case, as explained in detail above, Leapers and Continental claimed ownership of rights related to the "markings and objects or symbols of identification" on the Leapers scopes as those markings qualify as "property" under Indiana law subject to protection and also subject to theft, forgery, counterfeiting and conversion claims under Indiana law. Following Continental's investigation, revealing that Plaintiffs were using Leapers' proprietary designs, Leapers directed its

agent, Continental, to make a complaint to Indiana law enforcement. Pursuant to their normal course of operations, Prosecutor Gwinn and Sheriff Beckwith conducted their own analysis and investigation, ultimately determining that there was probable cause that a crime was committed. This kind of public action is precisely the type of activity that the Indiana anti-SLAPP statute is designed to safeguard. *See Dickens v. Provident Life and Acc. Ins. Co.*, 117 Cal. App. 4th 705, 708 (2004).

Protecting the public from criminal activity, and communicating with law enforcement in furtherance of those protections is at the core of a public issue. In fact, Indiana offers a qualified privilege for "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he had a duty . . . if made to a person having a corresponding interest or duty." *Williams v. Tharp*, 914 N.E.2d 756 (Ind. 2009). And it is "well established that in Indiana, communications made to law enforcement to report criminal activity are qualifiedly privileged" and the purpose of which is "to enhance public safety by facilitating the investigation of suspected criminal activity." *Id.* Therefore, Defendants' report of Plaintiffs' criminal actions constitutes an act "in furtherance of [a] right of petition or free speech . . . in connection with a public issue or an issue of public interest. Ind. Code § 34-7-7-1. To determine otherwise would be counter to the very purpose of Indiana's anti-SLAPP statute and the qualified privilege.

b.     *Leapers and Continental Made the Report of Criminal Activity to Law Enforcement in Good Faith and With a Reasonable Basis in Law and Fact*

Good faith is defined as "a state of mind indicating honesty and lawfulness of purpose; belief in one's legal right; and a belief that one's conduct is not unconscionable." *Owens v. Schoenberger*, 681 N.E.2d 760 (Ind. Ct. App. 1997). Comparatively, bad faith requires a statement that the speaker "knew . . . was false or entertained serious doubts as to its truth." *Id.* And even if the speaker is motivated by self-interest, a statement is not made in bad faith if the speaker "genuinely believed that he was being factual and also believed it would be best for his community" to pursue the subject matter of the statement." *Id.*

Plaintiffs' cannot support the elements of their malicious prosecution claim where Defendants made a good faith complaint of criminal activity to law enforcement, an action that is privileged. Sheriff Beckwith and Prosecutor Gwinn acted independently in their determination to pursue

Plaintiffs. In fact, Leapers, nor any Leapers representatives, ever met either Detective Wies or Prosecutor Gwinn prior to Continental's investigation.

Second, Defendants did not act with malice. Malice exists "when the defendant publishes a . . . statement 'with knowledge that it was false or with reckless disregard of whether it was false or not." *Shepard v. Schurz Commc'ns*, Inc., 847 N.E.2d 219, 223 (Ind. Ct. App. 2006). Additionally, "[m]alice may be inferred from a total lack of probable cause, the failure to make a reasonable or suitable inquiry, or a showing of personal animosity." *Brown v. Indianapolis Hous. Agency*, 971 N.E.2d 181 (Ind. Ct. App. 2012) (internal citations omitted). Defendants neither published a false statement, or in reckless disregard of whether it was false nor can malice be inferred from their actions.

Leapers engaged Continental to investigate whether Plaintiffs were selling counterfeit scopes. After Continental's investigation, Leapers directed Continental to report Plaintiffs' criminal activity to the local law enforcement authorities in Vanderburgh County. At that point, Sheriff Beckwith and Prosecutor Gwinn lead and managed the investigation. Following additional investigation, and without Defendants' influence, Prosecutor Gwinn prepared the probable cause affidavit and neither the Dings, nor anyone at Continental had any control over the process while Prosecutor Gwinn was handling the prosecution. Thus, there is no malice.

Third, probable cause existed and was independently established by Sheriff Beckwith and Prosecutor Gwinn. Probable Cause is defined "as the apparent state of facts found to exist upon reasonable inquiry which would induce a reasonable, intelligent, and prudent man to bring an action." *Display Fixtures Co., a Div. of Stein Indus. V. R.L. Hatcher, Inc.*, 438 N.E.2d 26, 30 (Ind. Ct. App. 1982). In this case, probable cause was established not once but twice. Initially, Continental's investigation revealed that Plaintiffs appropriated Leapers' scope markings, which are protected property interests under Indiana law. Then, as explained in detail above, Sheriff Beckwith and Prosecutor Gwinn independently determined that there was sufficient information to prepare a probable cause affidavit for Plaintiffs. Those inquiries revealed a set of facts that would induce a "reasonable, intelligent and prudent man" to bring an action.

What is more, as explained in detail above, Leapers and Continental claimed ownership of

rights related to the "markings and objects or symbols of identification" on the scopes as those markings qualify as "property" under Indiana law subject to protection and also subject to theft, forgery, counterfeiting and conversion under Indiana law. Those claims, and only those claims, were relied upon by the detective, the prosecutor who authored the probable cause affidavit and the judge who issued the warrants. Any claim to the contrary flies in the face of established facts.

So, Defendants made a good faith report to law enforcement about suspected criminal activity pursuant to Indiana law allowing for an interest in the identifiable markings of the Leapers scopes. Defendants held (and maintain today) a belief in their legal right to assert their interest in the markings and to make a report focusing on Plaintiffs appropriation of their property.

The actions that form the basis of Plaintiffs' claims — *viz.* communication with law enforcement officials —are protected by Indiana's anti-SLAPP statute. Plaintiffs made the report to law enforcement lawfully, in pursuit of safety for the community and in protection of their established property interest. Plaintiffs' communications are entitled to privilege, and were made in furtherance of their free speech rights on a public issue. The material facts are undisputed and Leapers and Continental are, therefore, entitled to judgment as a matter of law against Plaintiffs for dismissal of the malicious prosecution claim, attorney's fees and costs.

### IV.   CONCLUSION.

WHEREFORE, this Court should partially dismiss the Complaint under NRS 41.635-70 and award fees and costs, as well as discretionary punitive damages and a statutory award up to $10,000.

DATED May 23, 2017.

CARBAJAL & MCNUTT, LLP


*/s/ Matt Wolf*
DANIEL R. MCNUTT (SBN 7815)
MATTHEW C. WOLF (SBN 10801)
625 South Eighth Street
Las Vegas, Nevada 89101

*Attorneys for Defendants Continental Incorporated, Inc., and Leapers, In*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF MAILING

I HEREBY CERTIFY that pursuant to F.R.C.P. 5 on May 23, 2017, I caused service of the foregoing **DEFENDANTS' SPECIAL MOTION TO DISMISS PURSUANT TO NRS 41.635-70 (ANTI-SLAPP)** by mailing a copy by United States Postal Service, postage prepaid, via email, and/or via electronic mail through the United States District Court's CM/ECF system to the following at their last known address or e-mail:

JEFFREY I. PITEGOFF (SBN 5458)
MORRIS, SULLIVAN, LEMKUL & PITEGOFF, LLP
3770 Howard Hughes Parkway, Suite 170
Las Vegas, Nevada 89169
Tel. (702) 405-8100 / Fax (702) 405-8101
Attorney for Plaintiffs

_/s/ Lisa Heller_____
An Employee of Carbajal & McNutt LLP